OPINION
{¶ 1} Defendant-appellant, George Ware, IV, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of murder, aggravated robbery, kidnapping, arson, abuse of a corpse, and tampering with evidence. Because the trial court committed no reversible error, and because sufficient evidence and the manifest weight of the evidence support the trial court's judgment, we affirm.
 {¶ 2} Pursuant to indictment, defendant was charged with aggravated murder with specifications, one count of aggravated robbery, one count of kidnapping, one count of arson, one count of abuse of a corpse, and one count of tampering with evidence. The indictment arose from the death of Suzanne Dalton ("victim"), whose extensively burned body was found December 8, 2002 in the trunk of a burning car in Youngstown, Ohio. The autopsy revealed the victim was shot in the back of the head and had a broken cheekbone from a blunt force impact.
 {¶ 3} The state sought to have the death penalty imposed upon defendant. The jury, however, convicted defendant of all counts except aggravated murder, instead finding defendant guilty of murder. Defendant was sentenced to life in prison with no possibility of parole. Defendant appeals, assigning the following errors:
1. The trial court abused its discretion when it violated Evidence Rule 403(A) and admitted into evidence gruesome pictures of Suzanne Dalton's charred corpse which had minimal or no relevance.
2. The trial court erred when it permitted testimony about a supposed match between blood found at a possible crime location and the DNA of Suzanne Dalton when no testimony about Suzanne Dalton's DNA was presented.
3. The trial court erred in permitting testimony of Ann Marie Dring about a supposed match of handwriting samples between two State's exhibits, when the source of the two samples was and is unknown to her.
4. The trial court erred in permitting Kimberly King to testify about her opinion that Defendant-Appellant George Ware was present in a bar with Suzanne Dalton when that opinion was the product of suggestive media coverage assisted by law enforcement personnel.
5. The trial court erred in limiting the cross-examination of State's witness Diane Knaff.
6. The verdict was against the manifest weight of the evidence.
7. The verdict was not supported by sufficient evidence.
 {¶ 4} We first address defendant's sixth and seventh assignments of error, as they involve a discussion of the facts that will be pertinent to other assigned errors. In the sixth and seventh assignments of error, defendant contends the jury verdict is not supported by sufficient evidence and is against the manifest weight of the evidence.
 {¶ 5} Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Thompkins (1997),78 Ohio St.3d 380, 386. Sufficiency is a test of adequacy. Id. We construe the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus; State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387.
 {¶ 6} When presented with a manifest weight argument, we engage in a limited weighing of the evidence to determine whether the jury's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. Conley, supra; Thompkins, at 387 (noting that "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony"). Determinations of credibility and weight of the testimony remain within the province of the trier of fact. Statev. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The jury thus may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part or none of a witness's testimony." State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21, citing State v. Antill
(1964), 176 Ohio St. 61, 67.
 {¶ 7} According to the state's evidence, on the morning of December 8, 2002, Sergeant Bobovynik, with the Youngstown Police Department, saw black smoke coming from an area behind an old bar known as the Red Carpet Lounge, and he there discovered a Lincoln Town car in flames. The car was registered to Richard Dalton, the victim's husband. The fire was extinguished, and the victim's charred body was found in the trunk. Dental records confirmed the body was that of Suzanne Dalton.
 {¶ 8} Two independent witnesses confirmed the fire was intentionally set using some type of accelerant. Youngstown Police Department crime lab technician Robert Mauldin, who went to the scene, testified that the car was "completely burned, gutted on the inside and trunk area." (Tr. Vol. 7, 1291.) According to Mauldin, he did not conduct any testing on the vehicle because it was so badly burned: "I felt any possible fingerprints, anything off the body of the car would have been impossible." (Tr. Vol. 7, 1297.)
 {¶ 9} Expert forensic pathologist Dr. Felo performed the autopsy of the victim. Dr. Felo testified that the victim had a laceration, as well as a broken cheekbone from a blunt force. Dr. Felo stated that, although not immediately fatal, the victim died as a result of a gunshot wound to the back of the head near the right ear. The bullet exited through the lip area of the victim's mouth.
 {¶ 10} The day following the murder, Diane Knaff heard about it and went to the victim's home. Knaff informed the victim's husband that she was with the victim the previous night and into the early morning. Knaff testified that the two started out at Club Aces around 7:30 or 8:00 p.m. and remained there for several hours. The bartender at Club Aces, Kim King, testified the victim and Knaff, who came to the bar together, sat at the bar for an hour and one-half to two hours. According to King, the victim was wearing a gold herringbone necklace. At some point, Knaff went to the restroom, and when she returned she went to the other side of the bar to play a video game. Knaff continued playing the game until leaving Club Aces. King testified that during the time Knaff was playing the video game, a man came from behind the victim and sat down beside her. King stated the man sat with the victim for much of the rest of the evening until they left. King further offered that the video game somewhat blocked the view between Knaff and the victim.
 {¶ 11} King testified defendant was the man she saw talking with the victim at Club Aces on December 7, 2002. Although King did not identify defendant in a photograph the police presented to her on December 8, she subsequently recognized defendant's picture on the news. King explained that the police photograph did not do justice to defendant's appearance, and although she felt that she recognized him, she did not want to identify the wrong man. When King saw defendant's picture on the news, she immediately recognized him and testified that that picture was more "face on," more of defendant's actual "appearance." (Tr. Vol. 8, 1708-1709.)
 {¶ 12} Another bar patron, Sharie Ohlman, testified that she noticed the victim at Club Aces because the victim was the only other white person. Ohlman stated that at some point, Knaff, whom Ohlman referred to as the "black lady," went to play "video crack." (Tr. Vol. 8, 1743.) Ohlman testified she "rarely saw her face come out of the screen." Id. Ohlman noticed a black man take a seat beside the victim, a man with "very distinguished characteristics." (Tr. Vol. 8, 1745.) Ohlman subsequently recognized the victim's picture on the news and informed a Columbus police officer that she saw the victim at Club Aces and would do anything she could to help. Ohlman identified defendant in-court as the man she saw talking to the victim that night.
 {¶ 13} Around midnight, Knaff's co-worker called her and asked if she was coming to Sunrise bar, two buildings over from Club Aces. The co-worker testified that Knaff showed up alone and stayed until approximately 1:30 a.m.
 {¶ 14} State witness Charlotte Sensbaugh was the caretaker of the autistic child of Holly Washington, defendant's girlfriend. Washington lived at 3502 Hillcreek Court; defendant was on the lease with her for the months of November and December. According to Sensbaugh, defendant lived with them some of the time, and several times Sensbaugh went to Youngstown with Washington to visit defendant. Sensbaugh testified that she was watching Washington's child on Saturday, December 7, 2002; defendant was in Columbus that day. Sensbaugh put the child to bed and went to sleep. Washington woke up Sensbaugh in the middle of the night and informed her that Washington was leaving and would return Monday.
 {¶ 15} Rajendra Ingle, the owner of a jewelry store in a Youngstown area shopping mall, testified that on December 8, 2002, a couple came to his store to purchase jewelry, coming and leaving several times and eventually attempting to use a credit card to make the purchase. Ingle noticed the woman pull the credit card out of her pocket. He rang up the purchase but asked the woman for identification because he felt her behavior was odd. The couple left to obtain identification and never returned. Ingle cancelled the transaction.
 {¶ 16} The police subsequently presented Ingle with six photographs of males, and he identified defendant as the man in his store. He specifically remembered defendant because he was a difficult customer, meaning Ingle had to charge back defendant's purchase and cancel the transaction due to lack of identification. Ingle also identified Washington as the woman with defendant that day in the store. Although Ingle first identified Knaff as the woman with defendant, Ingle explained he did so because Knaff and Washington were similar in appearance to him, and, based on his culture, he does not pay attention to women that come in the store when they are with a man.
 {¶ 17} The following day, December 9, 2002, defendant went to a pawn shop, Gold Exchange, in Youngstown, Ohio, to pawn a gold herringbone necklace. Detective Elrico Alli was working at the shop that day and noticed defendant intently looking at him. Defendant eventually told Alli his name, which Alli recognized because he knew defendant's family. Alli observed that the necklace was missing the "o ring," indicating to Alli it had been broken off. Alli subsequently noticed a press release showing defendant as a suspect in a murder case, told another detective about his encounter with defendant at the pawn shop, and informed the detective about the necklace.
 {¶ 18} King and Richard Dalton testified that the necklace introduced at trial was strikingly similar to the one the victim was wearing on December 7, 2002. The parties stipulated that the signature on the pawn slip was defendant's signature. The state also produced a K-mart receipt with the victim's signature on it, evidencing her purchase of a gold herringbone necklace several days before she was murdered.
 {¶ 19} The state further presented evidence regarding concrete slabs that were removed from the carport area at 3502 Hillcreek Court after Detective William Snyder noticed suspicious purple spray paint on them. Although Debra Lambourne's initial test of the concrete revealed no blood, Lambourne conducted a second test after Detective Snyder removed the dust from the concrete, and the testing disclosed blood under the purple spray paint. Lambourne collected enough blood to perform DNA analysis, and it established the victim's blood was found on the concrete where defendant lived.
 {¶ 20} Keith Jones, an inmate with defendant, testified defendant told him a number of details about the murder. Jones even kept one of many notes written back and forth between him and defendant and turned it over to police. Handwriting expert, Ann Marie Dring, testified that the handwriting on the note was the same as a sample containing defendant's handwriting.
 {¶ 21} Jones testified defendant told him that he had planned to go to Club Aces to rob the victim because she had money, and that Washington, who acquired the information from Knaff, advised defendant the victim and Knaff would be at the bar that night. Defendant told Jones not only that the bartender, King, would be able to identify him as being in the bar, but that the victim gave defendant a ride home to 3502 Hillcreek Court. According to Jones, defendant said that when he started going through the victim's purse, she threatened to call the police. Defendant told Jones he struck the victim in the face and then shot her in the head when she was struggling to get out of the car. Jones testified that defendant said he tried to clean the blood off the carport and sprayed it with "spray paint of purple." (Tr. Vol. 10, 2056.)
 {¶ 22} Jones also testified to information defendant gave him about dragging the body to the trunk of a car, driving to Youngstown, Ohio, and setting the car on fire behind an old nightclub. Defendant told Jones that he took the body to Youngstown because he did not think anyone would be able to tie him to the murder. Jones further testified about the gold necklace and the pawn shop, stating defendant told Jones that a police officer working at the pawn shop knew him and could possibly link him to the murder.
 {¶ 23} In addition, Jones knew about the attempt to use the victim's credit card at Southern Park mall. Jones testified defendant told him that Washington admitted to using the credit card, and further stated that defendant was going to try to pin the murder on the victim's husband. Jones told the jury he received nothing from the state in exchange for his testimony. Jones stated he could be "killed" for being a "snitch," but testified because it was the right thing to do. (Tr. Vol. 10, 2061, 2066.) Jones did not want Richard Dalton to take the blame for something he did not do.
 {¶ 24} Defendant initially asserts insufficient evidence supports the jury's verdict. Contrary to defendant's assertions, the testimony of Keith Jones alone, if believed, supports the jury's verdict. Jones testified to conversations with defendant in which defendant admitted to planning to rob the victim, being in the bar with her, and having her drive him home. At his house, they struggled over his intent to take her purse, and he ultimately shot her. He put the body in the trunk of a car, drove it to Youngstown in an effort to avoid detection, and set the car on fire. The state's other evidence, largely circumstantial and construed in the state's favor, only adds further support to the sufficiency of the evidence.
 {¶ 25} Defendant nonetheless contends that due to inconsistencies in the testimony the state presented, the trial court's judgment is against the manifest weight of the evidence. For example, defendant argues that Ingle's incorrect identification of Diane Knaff as the woman in the store indicates that Knaff was involved. Defendant also takes issue with the fact that King could not identify defendant from the police photograph and only recognized him after a newscast. Defendant in addition maintains that the necklace was a standard piece of jewelry at K-Mart that cannot be positively identified as the victim's necklace. Defendant further contends that the testimony of Keith Jones, a career criminal, is inherently unreliable.
 {¶ 26} While our review of the manifest weight of the evidence involves a limited weighing of the evidence, inconsistencies in the testimony generally do not render the verdict against the manifest weight of the evidence. Raver,
supra; State v. Thompson (1998), 127 Ohio App.3d 511, discretionary appeal not allowed, 83 Ohio St.3d 1451 (stating that "[a] reviewing court must, therefore, accord due deference to the credibility determinations made by the fact-finder");State v. Craig (Mar. 23, 2000), Franklin App. No. 99AP-739, citing State v. Nivens (May 28, 1996), Franklin App. No. 95APA09-1236 (noting that "[w]hile the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence"). Indeed, the jurors need not believe all of a witness' testimony, but may accept only portions of it as true. Raver, at ¶ 21; State v.Burke, Franklin App. No. 02AP-1238, 2003-Ohio-2889, citingState v. Caldwell (1992), 79 Ohio App.3d 667. Given that test, we cannot say the jury clearly lost its way. To the contrary, the state presented compelling circumstantial evidence tending to demonstrate defendant's guilt.
 {¶ 27} Two witnesses observed defendant talking with the victim the night of the murder. The victim's blood was found at 3502 Hillcreek Court, where defendant lived in November and December with Washington. Ingle identified defendant as the man in his store attempting to use the victim's credit card on December 8, 2002. Detective Alli of the Youngstown Police Department observed defendant in the Golden Exchange pawn shop in Youngstown on December 9, 2002, where defendant pawned a gold Omega herringbone necklace, nearly identical to the one the victim was wearing that night, and signed the corresponding pawn slip.
 {¶ 28} Defendant nonetheless points to Ingle's initial misidentification of the woman with defendant in Ingle's store and to King's initial inability to identify defendant's photograph from among the six the police presented to her. Both witnesses, however, explained why they did so, and the jury could determine, premised on the witnesses' explanations, the weight the testimony of King and Ingle deserved. Similarly, the fact the victim's necklace did not have any unique characteristics distinguishing it from other gold necklaces did not compel the jury to conclude the necklace defendant pawned did not belong to the victim. Finally, although defendant impugns Jones' credibility, the jury's province included determining that credibility. Jenks, supra. The jury apparently resolved the issue in favor of the state, perhaps because Jones testified he had nothing to gain from his testimony.
 {¶ 29} Coupling Jones' testimony with the remainder of the state's evidence, we conclude defendant's convictions are not against the manifest weight of the evidence. Defendant's sixth and seventh assignments of error are overruled.
 {¶ 30} In the first assignment of error, defendant claims the trial court erred in admitting four prejudicial photographs in violation of Evid.R. 403. Defendant argues the pictures were not relevant to any fact in issue and served only to inflame and prejudice the jury.
 {¶ 31} When considering the admissibility of photographs under Evid.R. 403, the trial court generally must determine whether the danger of unfair prejudice to the defendant substantially outweighs the probative value of the evidence.State v. Morales (1987), 32 Ohio St.3d 252, 257. In State v.Maurer (1984), 15 Ohio St.3d 239, the Supreme Court explained the stricter evidentiary test in capital cases, stating that "[p]roperly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." Id., at paragraph seven of the syllabus. Thus, contrary to non-capital cases where the probative value may be minimal and the prejudice must be great before the evidence is excluded, in capital cases the evidence must be excluded if the probative value does not outweigh the prejudice to defendant.Morales, at 258.
 {¶ 32} Within those parameters, the admission of photographs is left to the sound discretion of the trial court. State v.Yarbrough, 104 Ohio St.3d 1, 2004-Ohio-6087; State v.Woodward, Franklin App. No. 03AP-398, 2004-Ohio-4418. "Unless the trial court clearly abuses its discretion, and the defendant has been materially prejudiced thereby," we will not disturb the trial court's decision. Id. Further, the fact a photograph is gruesome does not render it inadmissible if it proves useful to the jury. Id.
 {¶ 33} The court in Morales admitted concededly "gruesome" photographs depicting the murder scene and the victim's body before and during the coroner's examination. The court stated "[e]ach of these photographs illustrated testimony of state witnesses concerning the murder site, the cause of death and appellant's liability therefore [sic]." Id. at 258. The court further found the photographs probative in demonstrating defendant's intent and deliberation. Id.
 {¶ 34} The court reached the same conclusion with regard to a close-up photograph depicting the victim's slit throat in Statev. Landrum (1990), 53 Ohio St.3d 107. See, also, Yarbrough,
supra; State v. Adams, 103 Ohio St.3d 508, 2004-Ohio-5845
(holding no error in admitting gruesome photographs to illustrate the testimony of the detective who helped describe the crime scene and establish intent, as photographs gave the jury an appreciation of the nature and circumstances of the crime and portrayed injuries suffered); Woodward, supra (holding the trial court did not abuse its discretion in a capital case in admitting photographs that showed the victim's injuries more clearly than the coroner's testimony and report alone); State v.White, Scioto App. No. 03CA2926, 2004-Ohio-6005 (holding the trial court did not abuse its discretion in admitting "undoubtedly gruesome" photographs showing half of the victim's head missing, blood spatter, and brain matter).
 {¶ 35} The trial court did not abuse its discretion in admitting the photographs in this case. It admitted only four autopsy photographs out of over twenty the state sought to introduce. The photographs illustrate the coroner's testimony with regard to the path of the bullet, the cause of death, and the victim's injuries. They depict the victim's broken cheekbone before her death, thus corroborating the testimony of Jones, to whom defendant admitted hitting the victim in the face. The photographs also corroborate Jones' testimony that defendant told him he shot the victim toward the back of the head and after the murder burned the victim's body in Youngstown, Ohio.
 {¶ 36} As such, the photographs gave the jury an appreciation for the nature and circumstances of the crime. None of the four photographs appealed solely to the jury's passion or prejudice; nor were they cumulative or repetitive. Although the pictures carried the potential for prejudice to defendant, as did most of the state's evidence, defendant did not suffer undue prejudice because of the pictures, as they illustrate other evidence the state presented. Defendant's first assignment of error is overruled.
 {¶ 37} In his second assignment of error, defendant contends the testimony the state offered regarding DNA analysis lacked a proper foundation. Specifically, defendant asserts that a sample of the victim's DNA must be in evidence in order for state's expert witness, Debra Lambourne, to testify about the DNA comparison she performed. Because no such sample is in evidence, defendant asserts the trial court erred in permitting Lambourne's testimony.
 {¶ 38} The decision to admit testimony of a qualified expert is within the sound discretion of the trial court. State v.Nasser, Franklin App. No. 02AP-1112, 2003-Ohio-5947, citingState v. Williams (1996), 74 Ohio St.3d 569. Pursuant to Evid.R. 705, an expert may testify in terms of opinion or inference, and give reasons for that opinion or inference, after the underlying facts or data are disclosed. An expert opinion or inference is not objectionable solely because it embraces an ultimate issue in the case. Evid.R. 704.
 {¶ 39} Evid.R. 703 governs expert opinion testimony and provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by [her] or admitted in evidence at the hearing." The rule thus unequivocally allows for two bases for expert opinion testimony: the expert's perception, or facts or data admitted in evidence. State v. Solomon (1990), 59 Ohio St.3d 124, 126
(stating "[i]t is important to note that Evid.R. 703 is written in the disjunctive. Opinions may be based on perceptions or
facts or data admitted in evidence"); State v. Hoover-Moore,
Franklin App. No. 03AP-1186, 2004-Ohio-5541. (Emphasis sic.)
 {¶ 40} As pertinent to the expert testimony of Lambourne, Detective Snyder went to the Hillcreek duplex, where defendant and his girlfriend stayed, to collect evidence. Snyder quickly noticed a fair amount of purple spray paint in the carport area that aroused his suspicion. Snyder ordered the concrete covered in purple paint be removed for further testing.
 {¶ 41} As noted, Lambourne's second test of the concrete slabs revealed blood, and Lambourne collected enough to perform a DNA analysis. Independent of Lambourne, Dr. Felo of the Cuyahoga County Coroner's officer performed the autopsy of the victim and filed a coroner's report. The coroner's report, admitted into evidence, indicates a DNA sample was taken from the victim's body, and the coroner sent Lambourne the victim's DNA standard. Lambourne's report, also admitted into evidence, indicates she received from the coroner the standard taken from the victim and determined the DNA sent to her matched the DNA found on the concrete. Defendant had the opportunity to cross-examine Lambourne and did not address the legitimacy of the sample.
 {¶ 42} Given those facts, the trial court did not abuse its discretion in permitting Lambourne's expert opinion testimony that the blood found on the concrete slab was the victim's blood. Defendant's argument that an actual sample of the victim's DNA must be admitted into evidence is without merit. To the contrary, sufficient evidence demonstrated that the DNA sample taken from the victim was maintained properly and was the same sample that Lambourne compared to the blood found on the concrete. Lambourne properly could base her opinion on facts or data admitted in evidence as well as those she perceived, in this case the coroner's report and her own testing. Defendant's second assignment of error is overruled.
 {¶ 43} By the third assignment of error, defendant argues the trial court erred in permitting Ann Marie Dring to testify to a match of handwriting samples. It is well settled that persons skilled in handwriting may make comparisons when they examine otherwise unfamiliar writings in the course of an investigation.State v. Loza (1994), 71 Ohio St.3d 61, overruled on other grounds; State v. Cochran (July 8, 1997), Lawrence App. No. 96CA27. Defendant does not contest that point, but instead asserts Dring's testimony was inadmissible because she did not know the source of the "known" sample.
 {¶ 44} At trial, defendant objected to the qualification of Dring as an expert, prompting the trial court to allow defendant to extensively voir dire Dring with regard to her qualifications and the procedures used in comparing handwriting. At the conclusion of the voir dire, the trial court determined Dring was an expert in handwriting analysis. The state proceeded with its direct examination of Dring.
 {¶ 45} During that examination, defendant did not challenge whether he authored the "known" sample, state exhibit L-1, that Dring used to compare to state exhibit L-2. Rather, at the conclusion of the evidence, as counsel discussed the admission of all exhibits with the trial court, defendant objected to its admission as a "voluminous * * * compilation of materials that has absolutely nothing to do with this case. And our concern is that the jury may review that material and may draw perhaps improper inferences for purposes of their consideration of this trial." (Tr. Vol. 10, 2193.) As a result of defendant's objection, exhibit L-1 was not admitted in evidence.
 {¶ 46} Because defendant's objection to Dring's qualifications as an expert does not serve as an objection to Dring's failure to identify the author of the known sample, defendant waived all but plain error. State v. Davis (1964),1 Ohio St.2d 28, paragraph two of the syllabus (noting that "[w]here counsel for an accused objects to admission of a confession on [a] specific ground * * * the accused, cannot, after trial, successfully maintain that the court erred in overruling the objection by then relying upon a valid ground for his objection which was not called to the court's attention at a time when such error could have been avoided and corrected");Zachariah v. Rockwell Intl. (1998), 127 Ohio App.3d 298;Hammond v. Nichols, Scioto App. No. 03CA2887, 2003-Ohio-6463 (stating that under Evid.R. 103[A][1], a party's objection must specify the grounds for the objection unless the specific objection is apparent from the record). Plain error is recognized only where the error is so serious that, but for the error, the outcome clearly would have been different and recognition is necessary to prevent a manifest miscarriage of justice. State v.Barnes (2002), 94 Ohio St.3d 21.
 {¶ 47} Defendant does not explain why Dring was required to know the source of the "known" sample when she testified only that the same person wrote both samples, but did not attempt to identify the author of either document. Moreover, although defendant asserts that Dring's testimony bolstered Jones' credibility in testifying that defendant wrote state exhibit L-2, defendant's contentions are not supported in the record. Because Dring did not purport to identify who wrote state exhibit L-2, she could not bolster Jones' testimony that defendant wrote it.
 {¶ 48} Specifically, Jones was the only witness to identify state exhibit L-1, the "known" sample, as defendant's handwriting. If the jury believed Jones' testimony that defendant wrote state exhibit L-2, it may, as a result of Dring's testimony, also have believed defendant wrote state exhibit L-1. State exhibit L-1, however, was not admitted into evidence, and Dring's testimony could not boost the credibility of Jones' testimony regarding the author of state exhibit L-2, as she did not testify who wrote it. As a result, even if the trial court erred in admitting Dring's testimony, we fail to see how it prejudiced defendant, much less to the level of prejudice required to demonstrate plain error. Defendant's third assignment of error is overruled.
 {¶ 49} In the fourth assignment of error, defendant asserts the trial court erred in permitting King, the bartender at Club Aces, to identify defendant, both pre-trial and in court, as the man she saw talking to the victim in Club Aces on December 7, 2002. Specifically, defendant argues that because King could not identify defendant from a police photograph and was able to identify him only after seeing a news broadcast with his picture, the identification should be suppressed as the product of suggestive media coverage assisted by law enforcement personnel.
 {¶ 50} A witness' pretrial identification of the suspect will be suppressed if the confrontation procedure was unnecessarily suggestive or unreliable under the totality of the circumstances.State v. Brown (1988), 38 Ohio St.3d 305, citing Manson v.Brathwaite (1977), 432 U.S. 98, 97 S.Ct. 2243. In Brown, an alleged attack victim was unable to identify the suspect from a police photograph. However, when the alleged victim saw the suspect in a courthouse corridor, the alleged victim was able to identify the suspect as the assailant. The defendant later claimed the identification was unnecessarily suggestive because the alleged victim was being followed by television cameras. The state argued that because the confrontation was not arranged by police but, rather, was purely accidental, no state action was implicated.
 {¶ 51} The court agreed with the state, noting that "[t]he rationale for excluding a tainted pretrial identification is to protect the defendant from misconduct by the state. In the facts before us, there was no state action. * * * The alleged suggestiveness of the identification, therefore, goes to weight and reliability of the testimony rather than admissibility. Moreover, any prejudicial effect of the testimony could have been cured by effective cross-examination." Brown, at 310-311 (finding not state action when a different alleged victim was unable to positively identify the suspect in a line-up or from a photograph, but was able to do so after the suspect's picture was in the newspaper).
 {¶ 52} This court held similarly in State v. Ward (Feb. 22, 2001), Franklin App. No. 00AP-241. In that case, several witnesses to a bank shooting identified the defendant incourt after seeing a television newscast showing defendant's picture. We held the due process guarantees of the United States Constitution "are not implicated absent state involvement contributing to the witness' pretrial exposure to the defendant." Id., citing Brown, supra. If the police have not manipulated the media in any way, exposure to media reports is not sufficient ground to suppress the identification. Ward, supra, quotingNorris v. State (1976), 265 Ind. 508; State v. Brown,
Trumbell App. No. 2002-T-0077, 2003-Ohio-7183 (noting that if no state action is involved, any alleged suggestiveness goes to the weight and credibility of testimony rather than admissibility).
 {¶ 53} Defendant, however, claims the police held a press conference in order to release his photograph, thereby initiating King's pre-trial identification of defendant. We preliminarily note that King observed defendant over a period of time. She testified she noticed a man she later identified as defendant talking to the victim for some time. King served alcohol to the victim as well as to defendant and testified that she was "very close" to the defendant, about arm's length away. (Tr. Vol. 8, 1717-1718.)
 {¶ 54} Although King did not positively recognize defendant until after his picture was shown on a television newscast, King testified she thought she recognized him in the police photograph; she simply was not 100 percent positive. King later recognized defendant because the photograph shown on the news was more "face-on," more of his normal "appearance." Id. at 1708-1709. In contrast to the photograph shown on the news, King noted that defendant's head in the police photograph was cocked back and his Adam's apple was prominent.
 {¶ 55} Based on this record, we can conclude only that King's viewing the newscast was purely accidental, not the product of police manipulation. Indeed, during a pre-trial hearing on a motion to suppress King's identification for the same reason as argued on appeal, defense counsel stated "[w]e're not alleging police misconduct." (Tr. Vol. I, 73.) Because the facts of this case reveal neither state action nor police misconduct, the alleged suggestiveness of King's identification goes to the weight and reliability of the testimony rather than admissibility, a matter addressed through effective cross-examination. Brown, supra; State v. Ball (Sept. 21, 2000), Franklin App. No. 99AP-1288. The identification testimony was properly admitted, and defendant's fourth assignment of error is overruled.
 {¶ 56} In the fifth assignment of error, defendant contends the trial court erred in limiting his cross-examination of Diane Knaff. Defendant claims Knaff was involved with the murder, or at least she was a suspect initially and cooperated with police throughout the investigation because of the previous allegations against her. He maintains he did not have the opportunity to fully develop such theories in cross-examination.
 {¶ 57} The admission or exclusion of evidence is a matter resting within the sound discretion of the trial court. State v.Ramirez, Franklin App. No. 01AP-859, 2002-Ohio-4298. Evid.R. 611(B) provides that cross-examination of a witness shall be permitted on all relevant matters and matters affecting credibility. Evid.R. 401 defines relevant evidence as that evidence having any tendency to make the existence of a fact that is of consequence to the action more or less probable than it would be without the evidence. Id. In the exercise of its discretion, the trial court may limit cross-examination in relation to the particular facts of the case. Ramirez, supra, citing State v. Acre (1983), 6 Ohio St.3d 140, 145. Likewise, the trial court may limit cross-examination based on concerns of harassment, prejudice, confusion of issues, repetition, or marginally relevant information. Ramirez, supra, citingDelaware v. VanArsdall (1986), 475 U.S. 673, 679,106 S.Ct. 1431; State v. Ward (Feb. 15, 1983), Franklin App. No. 82AP-451.
 {¶ 58} In Ward, the defendant claimed the trial court erred in limiting cross-examination of a co-defendant. During police officers' questioning of a witness, statements were made regarding who the police thought killed the victim. This court inWard stated that "[e]vidence should not be composed of mere speculation, but of hard facts. Having been presented the facts, it is for the jury to decide whether the facts presented prove guilt. * * * A defendant's right to cross-examine may not be unreasonably curtailed, but his right is not absolute and may in the appropriate case be limited to accommodate other legitimate interest in the criminal trial process. Chambers v. Mississippi
(1973), 410 U.S. 284; State v. Walker (1978),53 Ohio St.2d 192." Explaining, the court noted that both parties to the trial, the state and the defendant, are entitled to a fair trial. In accord with that premise, the court concluded that the trial court did not err in refusing "the admission of mere opinion, evidenced by an investigating officer." Id.
 {¶ 59} Here, Knaff testified on behalf of the state that she previously was married to Holly Washington's brother. According to Knaff, she and Washington had a close relationship and lived next door to each other in the same duplex. Knaff knew defendant as "G," Washington's boyfriend, but never really had personal contact with him. (Tr. Vol. 8, 1568.) Knaff informed Washington that Knaff and the victim were going out that night of December 7, possibly to Club Aces. Knaff stated she and the victim arrived at Club Aces about 7:30 or 8:00 p.m. and left around midnight. When they left Club Aces, Knaff went to Sunrise bar, just two buildings over from Club Aces, for a birthday party. According to Knaff, the next morning she and her brother went shopping first at Wal-Mart, then Kroger and finally Zettler Hardware.
 {¶ 60} During cross-examination, defendant began to question Knaff about statements the detectives made to her during the early stages of the investigation. The detectives initially considered Knaff a suspect because Ingle identified Knaff as the woman with defendant in his store on December 8, 2002. Knaff, however, provided an alibi; she produced receipts for her purchases at Wal-Mart and Zettler Hardware and gave those to the detectives. The detectives then went to Knaff's residence and located the specific items on the receipt. Knaff's brother also testified to Knaff's whereabouts and confirmed that they were shopping together that day. Moreover, Ingle subsequently identified Washington as the woman with defendant.
 {¶ 61} The state objected to any line of questioning regarding the detectives' theories that later were discarded. An extensive colloquy followed, involving the parties and the court, concerning information defendant sought to introduce. Specifically, defendant wished to introduce statements Michael Brown made to the police relaying information that Holly Washington gave him. Brown later recanted most of that information. The trial court stated: "I'm going to allow you to ask questions that you can make good faith basis questions that have proper foundation that you are aware of and that are not invented." (Tr. Vol. 8, 1601.)
 {¶ 62} The trial court did not abuse its discretion in limiting the cross-examination of Knaff to questions having a good-faith basis. To the contrary, the trial court took great care in deciding what should be admitted. Theories and statements the detectives articulated to Knaff that had no good-faith basis in fact were properly excluded. Ramirez, supra (holding that without defense counsel articulating a good-faith basis for questioning the witness, the trial court did not abuse its discretion in limiting cross-examination); Ward, supra. Further, Michael Brown's statements were inadmissible hearsay, as well as arguably unreliable since he recanted.
 {¶ 63} Despite the trial court's limitation, defendant was able to cross-examine Knaff extensively about her whereabouts. Knaff was forced to acknowledge that nothing on the receipts she presented to police had her name on them to prove she, as opposed to her brother, purchased the items. Defendant also cross-examined Knaff regarding Ingle's identification of her picture as the woman with defendant on December 8, 2002 who attempted to use the victim's credit card. In addition, defendant cross-examined Knaff about whether she initially was a suspect. In the end, the jury was exposed to information that could be viewed as implicating Knaff, but the jury, as was its province, weighed her testimony and apparently found it credible. Jenks,
supra. Defendant's fifth assignment of error is overruled.
 {¶ 64} Having overruled all of defendant's assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
Klatt and Deshler, JJ., concur.
Deshler, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.