STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | CASE NO. 12 MA 185 |
| V. | ) | |
| | ) | OPINION |
| DAWAN FULLER, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:      Criminal Appeal from Court of Common Pleas of Mahoning County, Ohio Case No. 11CR1359A

JUDGMENT:      Affirmed in part. Reversed in part and Remanded.

APPEARANCES:

For Plaintiff-Appellee      Paul Gains
Prosecutor
Ralph Rivera
Assistant Prosecutor
21 W. Boardman St., 6th Floor
Youngstown, Ohio 44503

For Defendant-Appellant      Attorney Rhys Cartwright Jones
42 North Phelps Street
Youngstown, Ohio 44503-1130

JUDGES:

Hon. Gene Donofrio
Hon. Joseph J. Vukovich
Hon. Cheryl L. Waite

Dated: March 27, 2014

DONOFRIO, J.

{¶1} Defendant-appellant, Dawan Fuller, appeals from a Mahoning County Common Pleas Court judgment convicting him of two counts of attempted murder, with accompanying firearm specifications, following a bench trial.

{¶2} In the early evening of November 23, 2011, Robert Shaffer and his mother, Michele Holmes, were each shot several times while in their home on Youngstown's west side. They both survived the assault.

{¶3} According to Shaffer and Holmes, two men came into their home and shot them. They identified one of the men as Sherrick Jackson. They both knew Jackson. Shaffer later identified appellant in court as the other man, although he could not positively identify appellant in a photo lineup.

{¶4} According to Shaffer's next-door neighbors, Brandon Randall and Jamie Seaman, appellant and Jackson were visiting at their house just prior to the shooting along with appellant's son and Jackson's girlfriend. And when Seaman heard gunshots, Randall went to Shaffer's house and saw appellant and Jackson standing over Shaffer and Holmes.

{¶5} According to Jackson, however, he acted alone in the shooting. He claimed that appellant did not even go with him to Shaffer's house. Appellant is Jackson's younger brother.

{¶6} A Mahoning County Grand Jury indicted both appellant and Jackson on two counts of attempted murder, first-degree felonies in violation of R.C. 2903.02(A)(D) and R.C. 2923.02(A), and two counts of felonious assault, second-degree felonies in violation of R.C. 2903.11(A)(2)(D). Firearm specifications accompanied all counts. Both men pleaded not guilty to the charges in the indictment.

{¶7} Jackson eventually entered a guilty plea just prior to trial to all counts in the indictment.

{¶8} The case against appellant proceeded to a bench trial. The trial court found appellant guilty of all charges and specifications. At a later sentencing hearing, the court merged the felonious assault counts with the attempted murder counts and

also merged the specifications for those counts. The court then sentenced appellant to ten years on each of the attempted murder counts and three years on each of the firearm specifications and ordered that the sentences run consecutively. Thus, the court sentenced appellant to a total of 26 years in prison.

{¶9} Appellant filed a timely notice of appeal on October 16, 2012.

{¶10} Appellant raises three assignments of error, the first of which states:

THE TRIAL COURT ERRED IN ENTERING JUDGMENTS OF CONVICTION ON THE COUNTS OF THE INDICTMENT, INSOFAR SUFFICIENT EVIDENCE DID NOT SUPPORT THE ELEMENTS OF IDENTITY, AND THE MANIFEST WEIGHT OF THE EVIDENCE DID NOT SUPPORT THE ELEMENT OF IDENTITY.

{¶11} Appellant argues his conviction is against the manifest weight of the evidence because the trial court ignored the testimony of the only eyewitness. He asserts Jackson was the only person who actually saw what happened on the night in question and he testified that appellant was not there.

{¶12} Additionally, appellant asserts that Jackson's testimony is the only testimony that makes sense in this case. He contends that to believe Randall, one would have to believe that Randall was in Shaffer's house or that he saw the exchange through draped windows. And appellant contends that to believe Shaffer, one would have to account for the fact that he was unable to identify appellant until he was in court, after having read articles implicating appellant.

{¶13} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 668 (1997). "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial,

to support one side of the issue rather than the other.'" *Id.* (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. *Id.* at 390.

**{¶14}** Yet granting a new trial is only appropriate in extraordinary cases where the evidence weighs heavily against the conviction. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). This is because determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts who sits in the best position to judge the weight of the evidence and the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *State v. Rouse*, 7th Dist. No. 04-BE-53, 2005-Ohio-6328, ¶49, citing *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Thus, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. No. 99-CA-149, 2002-Ohio-1152.

**{¶15}** The trial court found appellant guilty of two counts of attempted murder in violation of R.C. 2903.02(A) and R.C. 2923.02(A). Pursuant to those sections, no person shall purposely engage in conduct that if successful would cause the death of another. It also found appellant guilty of two counts of felonious assault in violation of R.C. 2903.11(A)(2), which provides that no person shall knowingly cause serious physical harm to another.

**{¶16}** The testimony was uncontroverted that Shaffer and Holmes were shot multiple times and that Jackson was one of the shooters. The only question at trial was whether appellant was with Jackson at the time and also shot the victims. The evidence at trial was as follows.

**{¶17}** Youngstown Police Officer Ronald Jankowski was one of the first responders to the scene. (Tr. 23). He stated that when he arrived he found Shaffer and Holmes on the floor bleeding. (Tr. 24-25). He also saw Randall there. (Tr. 24).

Officer Jankowski asked Shaffer who shot him. (Tr. 26). He testified that Shaffer pointed to Randall and said, "Ask him. It was his cousin." (Tr. 26). Officer Jankowski then asked Randall. (Tr. 26). Officer Jankowski testified that at first Randall did not want to say anything, but he then told the officer it was Jackson and appellant. (Tr. 26).

{¶18} Michele Holmes testified that on the day in question she was about to go out the back door to get her dog when a man put his hand around her mouth and brought her into the kitchen. (Tr. 38). She stated that she called to Shaffer, who was in the dining room, and he came to see what was happening. (Tr. 39-40). Holmes testified that the two men, one of whom she identified as Jackson, pulled out their guns and started shooting Shaffer. (Tr. 40-41). Holmes knew Jackson. (Tr. 53). She stated that Jackson shot her and both Jackson and the other man shot Shaffer. (Tr. 41). She was shot four times. (Tr. 46). Holmes stated that both men were wearing dark coats or hoodies. (Tr. 42).

{¶19} Shaffer testified that earlier that day Jackson and appellant had been to his house talking about a woman, who had been at Shaffer's house to buy drugs, stealing their wallet. (Tr. 64-65). He stated that the two men then left his house. (Tr. 67). Shaffer testified that less than an hour later, the two men came back. (Tr. 67-68). Shaffer stated that when they came back, he was doing a line of cocaine, his mother was taking the dog out, and his brother, William Shaffer, was in the house. (Tr. 68-69). He heard his mother cry for help from the kitchen and went to see what was going on. (Tr. 69-70). Shaffer found Jackson holding Holmes with one hand and a gun with the other hand. (Tr. 71). He also saw appellant in the kitchen. (Tr. 73). Shaffer testified that when he walked into the kitchen, appellant shot him repeatedly. (Tr. 74). He stated the neighbors began coming to his house, so appellant and Jackson ran out. (Tr. 76). Shaffer testified they stole approximately $1,000 worth of marijuana, $1,000 worth of cocaine, and over $1,000 cash from his house. (Tr. 76-77).

{¶20} On cross examination, Shaffer stated that he learned appellant's name

from the "paper," although he stated it was not the newspaper. (Tr. 86, 123). And he admitted that when the police showed him photo lineups, although he positively identified Jackson, he did not positively identify appellant. (Tr. 116). Instead, he stated that one photo might be him or could be him and another photo looked like him. (Tr. 116-119).

{¶21} William Shaffer corroborated Shaffer's account of what happened earlier that day. He stated that Shaffer had a woman over earlier in the day and then appellant and Jackson came over and told Shaffer that the woman stole their money. (Tr. 128). William stated that appellant and Jackson then left. (Tr. 129). Later, while he was upstairs, William heard a knock at the door, followed by an argument, and then gunshots. (Tr. 129-130). When he came downstairs, William stated he saw someone with a hat and black coat shooting at the ground. (Tr. 130-131). He then found his mother and brother on the ground. (Tr. 132). He grabbed some rags and put pressure on their wounds. (Tr. 132). William stated that he did not have a gun and no guns were in the house. (Tr. 133).

{¶22} Brandon Randall testified that on the day in question, appellant and Jackson, whom he referred to as his "God-brothers," were at his house "hanging out" along with appellant's son, Jackson's girlfriend, and Randall's girlfriend and their children. (Tr. 144-145). Randall stated that eventually he fell asleep on the couch until he was awoken by his girlfriend telling him she heard gunshots next door at Shaffer's house. (Tr. 145). He testified that he ran to Shaffer's house and opened the door. (Tr. 146). Randall saw appellant and Jackson standing over Shaffer and Holmes. (Tr. 146). He then went back to his house, waited a few minutes, and then went to see if Shaffer and Holmes were okay. (Tr. 147). When he returned, Shaffer found William, who asked to use his phone. (Tr. 148). When the police arrived and asked Shaffer who shot him, Randall testified, Shaffer told the police to ask Randall because "they was his brothers." (Tr. 148). Randall stated that he initially resisted identifying appellant and Jackson because they were his family. (Tr. 149).

{¶23} On cross examination, Randall admitted that during his police interview

he never stated that he walked into Shaffer's house. (Tr. 157). Instead, he stated that he looked through Shaffer's door, which has a curtain over it. (Tr. 157-158). Randall tried to clarify his statements by saying he just stepped in the doorway. (Tr. 158).

**{¶24}** Jamie Seaman is Randall's girlfriend. She corroborated Randall's testimony about appellant and Jackson "hanging out" at their house that day. (Tr. 177). She stated that Jackson left briefly and went to Shaffer's to talk about money missing from his wallet and then he returned to her house. (Tr. 179). Seaman testified that Randall fell asleep and appellant and Jackson put on their black jackets and hats and left. (Tr. 180). She did not ask where they were going. (Tr. 181). Approximately half an hour later, Seaman heard gunshots and woke Randall. (Tr. 181-182). She stated Randall got up and went out the back door, came back in, and then went out once more. (Tr. 182). Detective-Sergeant Ronald Rodway administered the photo lineups to Shaffer and Holmes. He testified that when Shaffer looked at appellant's photograph, Shaffer stated that it looked like him "a little bit." (Tr. 204). Det. Rodway stated that Holmes failed to make any identification of appellant. (Tr. 205).

**{¶25}** Jackson testified in appellant's defense. He stated that on the day in question, he was at appellant's house with appellant and appellant's son when he called Randall for a ride to go get drugs. (Tr. 222). Randall picked Jackson up and brought him to Randall's house. (Tr. 222). Jackson stated that he "hung out" at Randall's house for a while and they smoked some marijuana. (Tr. 224). He then went to Shaffer's house to buy some cocaine, which he had bought from Shaffer in the past. (Tr. 225, 227). He stated he knocked on the door and Shaffer answered. (Tr. 227). Jackson and Shaffer went into the dining room and were "talking about business." (Tr. 227). Jackson thought that the cocaine Shaffer was selling him was not the correct weight for the price. (Tr. 227-229). He testified this led to a verbal argument between him and Shaffer. (Tr. 229). While they were yelling at each other, Jackson stated, William came down the steps shooting. (Tr. 229). Consequently,

Jackson pulled out his gun and began to shoot as he backed out of the house. (Tr. 229). He stated he shot approximately five times and then ran from the house. (Tr. 230). Jackson then "caught a ride" back to appellant's house. (Tr. 231).

{¶26} Jackson testified that appellant was never with him at Shaffer's house. (Tr. 231). He stated appellant was home with his son during the entire incident. (Tr. 231).

{¶27} The state and defense also entered a stipulation that five of the six shells recovered by the police were fired from the same gun, while the sixth shell did not match the other five. (Tr. 207-208). Additionally, they stipulated that a gunshot residue test performed on William was positive. (Tr. 207).

{¶28} The weight of the evidence supports appellant's conviction. Appellant claims that Jackson was the only eyewitness to testify, so we should believe his version of the events. But that is not accurate. Both Shaffer and Holmes were eyewitnesses. And while they were not able to identify appellant in the photo lineup, they were both certain that two men came into their home and shot them. If we were to believe Jackson, who stated that he went to Shaffer's house alone, then both Shaffer and Holmes would have to have been lying when they told the police that two men shot them. Moreover, when Shaffer saw appellant's photograph in the lineup, he stated that it looked a little bit like the shooter.

{¶29} Additionally, Shaffer's identification of appellant at trial was further bolstered by Randall's and Seaman's testimony. Both Randall and Seaman stated that appellant and Jackson were "hanging out" at their house prior to the shooting. They both stated that Randall fell asleep. Seaman stated that appellant and Jackson then left together. Within a half an hour later, she heard gunshots and woke Randall. Randall stated he ran to Shaffer's house where he saw appellant and Jackson standing over Shaffer and Holmes. There was some inconsistency between Randall's initial statement to police and his testimony in court as to whether he actually entered Shaffer's house or just looked through the door. But his testimony was consistent with his statement to police just after the shooting that the culprits

were appellant and Jackson. Randall identified appellant and Jackson even though they were his "God-brothers."

**{¶30}** Jackson's testimony, however, was inconsistent with the testimony of all of the other witnesses. According to Jackson, appellant never left home on the day in question, not even to go to Randall's house. This contradicts Randall's and Seaman's testimony that appellant and Jackson were at their house for some time that day before the shooting. Additionally, Jackson stated that William began shooting, which caused him to open fire. This contradicts William's testimony. William testified he did not have a gun and he did not come downstairs until the shooting was almost over. And according to Jackson he went alone to Shaffer's house. This contradicts Shaffer's and Holmes' testimony that two men entered their house and shot them.

**{¶31}** As an appellate court, we are permitted to independently weigh the credibility of the witnesses when determining whether a conviction is against the manifest weight of the evidence. *State v. Wright*, 10th Dist. No. 03AP-470, 2004-Ohio-677, ¶11. But we must give great deference to the fact finder's determination of witnesses' credibility. *Id.* The policy underlying this presumption is that the trier of fact is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *Id.*

**{¶32}** In this case, the trier of fact must have found Jackson's testimony lacked credibility. This is likely because the great majority of the evidence weighed against his testimony. Appellant's conviction is supported by the weight of the evidence.

**{¶33}** Accordingly, appellant's first assignment of error is without merit.

**{¶34}** Appellant's second assignment of error states:

THE TRIAL COURT ERRED IN TAKING EVIDENCE OF AN OVERLY-SUGGESTIVE IN-COURT IDENTIFICATION.

**{¶35}** Here appellant contends the trial court should not have allowed Shaffer to make an in-court identification of him, given that Schaffer was unable to previously identify him. He contends Schaffer learned his name from the press.

**{¶36}** We review a trial court's decision to admit an in-court identification for an abuse of discretion. *State v. Mikolaj*, 7th Dist. No. 05-MA-157, 2007-Ohio-1563, ¶14. Abuse of discretion connotes more than an error of law or of judgment; it implies the trial court's decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

**{¶37}** Det. Rodway testified that when he showed Shaffer the photo lineup with appellant's picture Shaffer stated that it "looks like him a little bit." (Tr. 198).

**{¶38}** Appellant does not take issue with the photo array nor did he argue that Shaffer's ambiguous quasi-identification of him should have been suppressed.

**{¶39}** During his testimony, Shaffer identified appellant as the man that shot him. (Tr. 66, 124-125). Appellant objected. (Tr. 66, 124-125).

**{¶40}** Shaffer also identified appellant by name at trial. But he was not entirely clear how he had learned appellant's name. When asked by defense counsel where he learned appellant's name, Shaffer stated, "I seen it in the paper. I identified him right off the grid before I knew his name." (Tr. 86). But later when defense counsel mentioned that Shaffer learned appellant's name from the newspaper, Shaffer stated, "I ain't say the newspaper. I didn't see the newspaper. I seen it in the paper. My cousin showed me the paper." (Tr. 122). Shaffer stated it was not a newspaper but "a paper I was seeing from my family" where he "knew who it was by his face." (Tr. 123).

**{¶41}** In addressing potentially tainted photo arrays, it has been held that "witness exposure to photographs of the suspect shown on television prior to identification does not require suppression of the identification." *State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634 (10th Dist.), ¶55. Moreover, if no state action was involved in the pretrial exposure to a newscast showing the defendant's picture, any suggestiveness goes to the weight and credibility of the

witness's testimony, not to its admissibility, and is best addressed on cross examination. *State v. Ware*, 10th Dist. No. 00AP-43, 2004-Ohio-6984, ¶55.

**{¶42}** Here it is unclear exactly where Shaffer saw appellant's picture or learned his name. But if it was from a newspaper article or other news source, this would not require the court to exclude his identification of appellant. Instead, it would go to the weight and credibility to be given to the identification.

**{¶43}** Moreover, the trial court, as the finder of fact in this case, was in the best position to observe Shaffer and judge the reliability of his identification. And given that this was a bench trial, we can presume the court, when considering the in-court identification, also took into consideration the fact that Shaffer failed to positively identify appellant in the photo lineup. Thus, we cannot find that the trial court abused its discretion in allowing Shaffer's in-court identification of appellant.

**{¶44}** Accordingly, appellant's second assignment of error is without merit.

**{¶45}** Appellant's third assignment of error states:

THE TRIAL COURT ERRED PLAINLY IN MERGING FULLER'S SENTENCES, RATHER THAN REQUIRING THE STATE TO ELECT THE CHARGE AS TO WHICH THE CONVICTION WOULD ATTACH, AND IN SENTENCING FULLER TO 10 YEARS ON HIS SECOND-DEGREE FELONY CONVICTIONS.

**{¶46}** Finally, appellant takes issue with his sentence. He argues that because he was convicted of allied offenses of similar import, the trial court was only to sentence him on one of the allied offenses instead of sentencing him on both and then merging the sentences. He claims this violated R.C. 2941.25. Additionally, appellant argues the trial court erred in sentencing him to ten years on each of the felonious assault counts because the maximum sentence for these second-degree felonies was eight years. Therefore, he contends his sentence is contrary to law. Appellant asserts we must reverse his sentence and remand the matter for a new sentencing hearing.

{¶47} R.C. 2941.25(A) provides: "Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one."

{¶48} "[F]or purposes of R.C. 2941.25, a 'conviction' is the combination of a guilt determination and a sentence or penalty." *State v. Damron*, 129 Ohio St.3d 86, 2011-Ohio-2268, 950 N.E.2d 512, ¶17, citing, *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶12.

{¶49} In this case, the offenses of attempted murder and felonious assault were allied offenses of similar import. The trial court made such a finding at sentencing. (Sen. Tr. 16). Thus, while the state was able to indict and bring appellant to trial on two counts of attempted murder and two counts of felonious assault, appellant could only be convicted of one of each of the allied offenses.

{¶50} The trial court complied with R.C. 2941.25 at the sentencing hearing. At the sentencing hearing, before imposing sentence, the trial court found that count one (attempted murder) and count two (attempted murder) merged with count three (felonious assault) and count four (felonious assault) and that the firearm specifications for those counts merged also. (Sen. Tr. 16). The court then sentenced appellant to ten years on count one, consecutive to three years on that firearm specification, and ten years on count two, consecutive to three years on that firearm specification, for a total of 26 years. (Sen. Tr. 17).

{¶51} The trial court's sentence, however, was not correctly set out in its judgment entry of sentence.

{¶52} The judgment entry states that appellant is sentenced to ten years in prison on count one (attempted murder), ten years in prison on count two (attempted murder), ten years in prison on count three (felonious assault), and ten years in prison on count four (felonious assault). It then states for sentencing purposes counts three and four are to merge with counts one and two for a total of 20 years. Additionally, counts three and four of the gun specifications are to merge with counts

one and two for a total of six years. The judgment entry states the total prison term is 26 years.

**{¶53}** There are two errors in the judgment entry. First, the court should have stated that the felonious assault counts merged with the attempted murder counts before setting out the sentence. Second, the court could not sentence appellant to ten years on felonious assault because it is a second-degree felony for which the maximum sentence is eight years, not ten. See R.C. 2929.14(A)(2).

**{¶54}** These errors, however, are clerical in nature. This is because the sentencing judgment entry does not accurately reflect the merger by the trial court or the sentence it imposed at the sentencing hearing. At the sentencing hearing, the trial court correctly merged the offenses and entered a lawful sentence on only the attempted murder counts and specifications. Because the errors with the sentencing judgment entry are clerical errors, the trial court may simply issue a new judgment entry to correct them. Crim.R. 36 provides that a court may correct clerical mistakes in judgments at any time.

**{¶55}** Appellant argues the trial court committed plain error by sentencing him to multiple sentences for allied offenses of similar import. He cites to decisions of this court in support of his position. See *State v. Robinson*, 7th Dist. No. 12-MA-128, 2012-Ohio-1686; *State v. Gardner*, 7th Dist. No. 10 MA 52, 2011-Ohio-2644. But those cases are distinguishable. In neither *Robinson* nor *Gardner* did the trial court correctly merge the allied offenses and impose the correct sentence at the sentencing hearing as the trial court did in the case at bar. Instead, they sentenced the defendants on both of the allied offenses and ordered the sentences to run concurrently. Thus, there could be no clerical error in those cases. But here, as stated above, the trial court complied with the merger statute at the sentencing hearing and sentenced appellant only on the attempted murder counts and accompanying specifications. It did not sentence him on the felonious assault counts and order the sentences to run concurrently.

**{¶56}** We are compelled, however, to raise a plain error with appellant's

consecutive sentences. Appellant's co-defendant, Jackson, raised the issue in his appeal. See *State v. Jackson*, 7th Dist. No. 12-MA-199, 2014-Ohio-777. In neither appellant's case, nor in Jackson's, did the trial court make the statutorily-required findings before imposing consecutive sentences.

**{¶57}** R.C. 2929.14(C)(4) provides:

4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender *and* that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, *and* if the court also finds *any of the following*:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶58}** Although the trial court is not required to recite the statute verbatim or utter "magic" or "talismanic" words, there must be an indication that the court found (1) that consecutive sentences are necessary to protect the public from future crime

or to punish the offender, (2) that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger posed to the public, and (3) one of the findings described in R.C. 2929.14(C)(4)(a), (b), or (c). *State v. Bellard*, 7th Dist. No. 12-MA-97, 2013-Ohio-2956, ¶17. The court need not give its reasons for making those findings. *State v. Power*, 7th Dist. No. 12 CO 14, 2013-Ohio-4254, ¶38.

{¶59} In sentencing appellant, the trial court stated:

Defendant Fuller was found guilty after a trial. The Court has also considered the principles and purposes of sentencing for Defendant Fuller, together with the recommendation contained in the pre-sentence investigation report that was prepared. The Court has considered both factors under 2929.11 and 2929.12.

* * * The Court finds the defendant should be sentenced to the Department of Rehabilitation and Corrections because he is not amenable to community control; that prison is consistent with the principles and purposes of sentencing.

(Sentencing Tr. 16-17).

{¶60} The judgment entry of sentence does not add any other findings by the trial court. It simply repeats the findings the court made at the sentencing hearing.

{¶61} The trial court failed to comply with R.C. 2929.14(C)(4) in sentencing appellant to consecutive sentences. The court did not make a finding that consecutive sentences were necessary to protect the public from future crime or to punish appellant. The court did not make a finding that consecutive sentences were not disproportionate to the seriousness of appellant's conduct and to the danger posed to the public. And the court did not find any of the three situations set out in R.C. 2929.14(C)(4)(a)(b)(c).

{¶62} We have found that even more comprehensive findings than those made here were insufficient to impose consecutive sentences. See *Bellard*, 2013-

Ohio-2956 (general statements about the seriousness of the defendant's conduct and his juvenile criminal history were not sufficient to comply with R.C. 2929.14(C)(4)); *State v. Esmail*, 7th Dist. No. 11-CO-35, 2013-Ohio-2165 (statement in judgment entry that court considered purposes and principles of sentencing and all other relevant factors pursuant to R.C. 2929.11 and R.C. 2929.12 along with statements at sentencing hearing regarding the defendant's criminal history and that sentence was consistent with Senate Bill 86 were not sufficient to impose consecutive sentences).

**{¶63}** An appellate court may, but need not, recognize plain error if substantial rights are affected, even if the error was not brought to the court's attention. Crim.R. 52(B). Yet before an appellate court can recognize plain error, it must find obvious error affecting such substantial rights that the error was outcome determinative. *State v. Noling*, 98 Ohio St.3d 44, 781 N.E.2d 88, 2002-Ohio-7044, ¶62. The failure of the trial court to make the required statutory findings before imposing consecutive sentences is plain error. *State v. Jirousek*, 11th Dist. Nos. 2013-G-3128, 2013-G-3130 2013-Ohio-5267, ¶39; *State v. Boynton*, 10th Dist. Nos. 12AP-975, 12AP-976, 2013-Ohio-3794, ¶12.

**{¶64}** Accordingly, appellant's third assignment of error has merit.

**{¶65}** For the reasons stated above, appellant's conviction is hereby affirmed. Appellant's sentence is reversed and the matter is remanded for a new sentencing hearing.

Vukovich, J., concurs.

Waite, J., concurs.